Paul H. BEST, Appellant,

v.

**MUNICIPALITY OF
ANCHORAGE, Appellee.**

Nos. A–443, A–444.

Court of Appeals of Alaska.

Dec. 27, 1985.

Craig Howard and Sen K. Tan, Asst. Public Defenders, and Dana Fabe, Public Defender, Anchorage, for appellant.

Allen M. Bailey, Mun. Prosecutor, and Jerry Wertzbaugher, Mun. Atty., Anchorage, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

On July 16, 1983, Paul Best was arrested for driving while intoxicated (DWI). AMC 9.28.020.[1] He consented to a chemical test of his breath to measure its alcohol content. An Intoximeter 3000 breath testing machine yielded a result of .23 grams of alcohol per 210 liters of breath. On August 27, 1983, Best was again arrested for DWI. His Intoximeter reading on this occasion was .20. The alcohol in each measured sample was captured in a magnesium perchlorate tube (MPT), in an effort to comply with our decision in *Anchorage v. Serrano*, 649 P.2d 256 (Alaska App.1982).

On April 17, 1984, District Court Judge Elaine Andrews issued rulings on motions to suppress Intoximeter results in the consolidated cases of ten DWI defendants. *Anchorage v. Ramiro Hernandez, et al.*, 3 ANM 83–4629 Cr. The movants argued that the magnesium perchlorate tube system of breath sample preservation was not yielding results of sufficient reliability to aid in verification of the Intoximeter results. *See Serrano*, 649 P.2d at 258. Judge Andrews' ruling was in the form of a written order, containing detailed findings of fact and conclusions of law.[2] The court's holding was as follows:

Perchlorate sample preservation is capable of becoming a technologically sound, efficient and effective method of breath preservation. It has not yet reached that point. The method of preservation and retesting often yields accurate results, and to the extent that the results of the re-test are accurate within 15% of the Intoximeter, this Court finds no basis on which to suppress the Intoximeter or re-test results. However, in more than half of the cases the results are erratic, and the only source of error that has been discovered is due to inadequate preparation by the Municipality to assure proper collection of the separate sample. To allow the Municipality to explain away the wildly erratic re-test results by detailing the negligent collection of the sample by untrained police officers and inadequate hardware being used to collect the sample would be patently unfair and deny the defendant his right to effective cross examination. For that reason the Intoximeter and re-test results will be suppressed in the above captioned cases.

Neither of Best's DWI cases had reached disposition by April 17, 1984. On April 24, 1984, Best's attorney requested that the case be set for calendar call in May, so that it could be set for trial in August. Instead, the presiding judge set both matters for trial call on May 1, 1984. On May 1, Best's attorney stated that he had thought this case was set for trial in August, and that he intended to file a motion to suppress the

---

1. AMC § 9.28.020 provides in pertinent part:
 A. It is unlawful for any person to commit the crime of driving while intoxicated.
 B. A person commits the crime of driving while intoxicated if he or she operates, drives or is in actual physical control of a motor vehicle or operates an aircraft or a watercraft:
 1. while under the influence of intoxicating liquor, depressant, hallucinogenic, stimulant or narcotic drugs as defined in AS 11.71.-140-.190; or
 2. when, as determined by a chemical test taken within four hours after the alleged offense was committed, there is 0.10% or more

by weight of alcohol in the person's blood or 100 milligrams or more of alcohol per 100 milliliters of blood, or when there is 0.10 gram or more of alcohol per 210 liters of the person's breath; or
 3. while he or she is under the combined influence of intoxicating liquor and a drug or drugs, or another substance, to a degree which renders him or her incapable of driving safely.

2. The entire order is attached as an appendix to this opinion.

Intoximeter results based upon Judge Andrews' findings in the *Hernandez* cases. On May 2, Best's attorney again stated that he would be filing a motion to suppress, and that he hoped Mr. Best's case would be consolidated with several others, and possibly set for evidentiary hearings. The prosecutor argued that the case should go as soon as possible, since Best's cases had already been set for trial and then continued upon the defendant's request at least twice. The prosecutor also argued that since Best had not had either of his perchlorate tubes tested, he had no standing to challenge the MPT collection procedures. Best's attorney replied that the essence of the motion to be filed was that there was no need to have the tubes tested, because the procedures were so poor that the results in an individual case were irrelevant.

Judge Andrews stated that she had already ruled in other cases that no such motion would be accepted unless the defendant had the tube tested, and "[t]hat's the ruling that's presently in effect in this courtroom." Judge Andrews set the matter for trial the same week, and it was placed on trailing status.

On May 3, 1984, Best's attorney filed a motion to suppress Intoximeter results, based upon *Serrano* and Judge Andrews' decision in *Hernandez*. The motion was denied the same day. On May 4, 1984, Best's attorney filed a motion for reconsideration of the court's ruling on the motion to suppress, and a motion for continuance of at least three weeks so that the perchlorate tubes could be tested. The motions were supported by an affidavit from counsel stating, *inter alia*, that Best had borrowed money to have his tubes tested, and that "defendant and counsel could not have anticipated the court's ruling of April 17, 1984." The motions were also supported by an affidavit by the Public Defender to the effect that her agency did not have and could not obtain sufficient funds to have the MPT of every DWI client tested.

Judge Andrews denied these motions as well. She reasoned that while her decision in April may have added incentive for DWI defendants to have their MPTs tested, the main incentive, a desire to verify the Intoximeter results, was already in place, and that Mr. Best had taken no steps in this regard in the months since his arraignment, despite this "original" incentive. Best's attorney argued that Best did not have the tubes tested because he did not have sufficient funds to pay the $115 per tube charged by the only in-state testing facility available to defendants, the Humana laboratory. Judge Andrews refused to alter her ruling, and Best was convicted of both DWIs by jury trial on May 7, 1984, based in part on the Intoximeter results.

On appeal, Best argues that Judge Andrews abused her discretion in refusing to grant a continuance and that she erred in denying the motion to suppress. The municipality argues that we should overrule our decision in *Serrano* based upon *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (no duty to preserve breath sample under fourteenth amendment); that even if *Serrano* is good law, Judge Andrews' decision in *Hernandez* was incorrect; and that even if the *Hernandez* decision were correct, Best had no standing to challenge the Intoximeter results. Finally, the municipality argues that there was no error in denying a continuance, under these circumstances.

■ We take the issues in somewhat different order. We decline to reconsider our decision in *Serrano*. In our view, *Serrano* and the case upon which it was based, *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976), rest upon independent state constitutional grounds. *See also Stephan v. State*, 711 P.2d 1156, 1160 nn. 13–14 (Alaska, 1985). Moreover, the state has not argued that the Intoximeter differs so substantially from the breath-testing devices at issue in *Serrano* that the *Serrano* rule should not be applied to the Intoximeter. We therefore assume *arguendo* that *Serrano* applies to the Intoximeter.

■ Denial of a continuance will be overturned only upon a showing that the

court abused its discretion. *Salazar v. State*, 559 P.2d 66 (Alaska 1976); *Klockenbrink v. State*, 472 P.2d 958, 964 (Alaska 1970). We find no abuse of discretion here. Judge Andrews found that Best had taken no steps to have his tubes tested, even though there was a clear possibility that his cases would go to trial. Since the continuance was only requested on the grounds that time was needed to test the MPT, Best's lack of diligence was reason enough to deny the continuance. *See Salazar v. State*, 559 P.2d at 72.

The motion to suppress presents a separate question. Best's motion to suppress may well have been untimely, filed as it was on the day set for trial.[3] Best's attorney asserted that neither he nor Best could have anticipated Judge Andrews' ruling in *Hernandez*. This assertion begs the question: Best was in the same position as the ten defendants in *Hernandez*, except that he made no effort to have his MPTs tested or to find out if the municipality was in substantial compliance with our ruling in *Serrano*. That these matters were open for investigation is clearly demonstrated by the course of proceedings in *Hernandez*. The defendants in those cases moved to discover documents relating to the MPT system, subpoenaed numerous witnesses, and incorporated evidence taken in prior proceedings. The same path was open to Best, but he took no steps until after Judge Andrews made her ruling, some eight months after his initial arrest and Intoximeter test.

■ However, it appears to us that Judge Andrews' ruling was not based on timeliness so much as it was based upon a supposed lack of "standing." Since the trial court has discretion to rule on a motion even though it is untimely, we will not affirm on the grounds that the motion was untimely, where no specific finding of untimeliness was made below. *See Abruska v. State*, 705 P.2d 1261, 1271–72 (Alaska App.1985).

The logic behind Judge Andrews' ruling in *Hernandez* seemed to be that the only defendants who had been harmed were defendants whose MPT results were at substantial variance with their Intoximeter results. Under this view, to have "standing"[4] to make a *Hernandez* challenge, a defendant must demonstrate that a substantial variance exists. A defendant who never requested a test of his or her tube could not make such a showing.

■ Judge Andrews' focus on the variance between the MPT result and the Intoximeter result may not comport with the reasons behind our decision in *Serrano*. If the procedures detailed by Judge Andrews in her findings in *Hernandez* were so poor, and the problems with equipment so substantial and apparently so frequent, that the system as a whole was not yielding accurate results, an individual test of the MPT to demonstrate this fact would be less significant. If all MPTs are so flawed that an accurate retest is impossible, it cannot be said that those furnished MPTs have been furnished with a means of either verifying *or* casting doubt upon a breath test result. *See Serrano*, 649 P.2d at 258.

---

**3.** There was apparently a standing order in effect in district court requiring all motions to be filed within forty days of arraignment. *See also* Criminal Rule 12(b) and (e) (failure to raise pre-trial motions at the time set by the court shall constitute waiver thereof).

**4.** In context, the term standing has been defined to mean:

"Standing to sue" means that party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. Standing is a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court. The requirement of "standing" is satisfied if it can be said that the plaintiff has a legally protectible and tangible interest at stake in the litigation. Standing is a jurisdictional issue which concerns power of federal courts to hear and decide cases and does not concern ultimate merits of substantive claims involved in the action.

Standing is a requirement that the plaintiffs have been injured or been threatened with the injury by governmental action complained of, and focuses on the question of whether the litigant is the proper party to fight the lawsuit, not whether the issue itself is justiciable.

Black's Law Dictionary 1260–61 (rev. 5th ed. 1979) (citations omitted).

Judge Andrews' findings suggest that the MPT system was at times working so poorly that whether or not a given MPT result was close to the Intoximeter result was almost purely fortuitous. *See* Appendix A. If this is true, all DWI defendants whose MPTs were collected during these times have been harmed equally, and the actual results obtained from a test of the MPT would be essentially irrelevant. Where the results obtained are irrelevant, we think it unduly harsh to impose a requirement that defendants. have their tubes tested before moving for suppression.[5] We note that Best's attorney specifically argued that under Judge Andrews' rationale for her decision in *Hernandez*, Best should not be required to have his tubes tested in order to prevail on the motion. We also emphasize again that while Best's motion may have been untimely, this was not the reason assigned by Judge Andrews for denial, and therefore we may not affirm the denial solely on that basis. Because we cannot affirm either on grounds of untimeliness or lack of "standing," we remand this case to the trial court.[6]

■ The municipality argues that *Hernandez* was wrongly decided, and that none of the defendants were entitled to suppression, either in that case or afterward. Because of the seriousness of Judge Andrews' findings regarding the MPT system as implemented in Anchorage, we cannot agree that, as a matter of law, suppression was unwarranted in those cases. However, we do conclude that Judge Andrews' findings are not sufficient to support suppression in every case of DWI arising in Anchorage from July 1983 to May 1984 where a variance of plus or minus 15% existed between the Intoximeter result and the MPT result. In particular, her findings suffer from the same defect we observed in *State v. Kerr*, 712 P.2d 400 (Alaska App., 1985): it is not clear whether she faults the government for the design of the project in total or only its implementation in individual cases. It follows that Best will not automatically be entitled to suppression on remand. Accordingly, we offer some guidance to the trial court upon remand.

The proceedings in this case must be governed by our decision in *Anchorage v. Flack*, 685 P.2d 108 (Alaska App.1984). In *Flack*, the arrestee was given an Intoximeter test, but no sample was preserved because no perchlorate tubes were available. The trial judge suppressed the Intoximeter result, but his written conclusions were ambiguous with respect to the standard used. *Id.* at 110. We held that the *Serrano* standard "is essentially one of negligence, not strict liability":

> If the governmental unit was free of fault in failing to provide the defendant a means of verifying the breathalyzer result, then suppression should not follow. We stress, however, that the duty is

5. In *Begley v. State*, 711 P.2d 540, (Alaska App. 1985), we affirmed Judge Mason's denial of Begley's suppression motion, which was based on *Hernandez* Judge Mason concluded that all of the defects in collection and preservation of breath samples specified in the *Hernandez* decision would have resulted in a test result *lower* than the Intoximeter result. Begley's result was higher. Thus, Judge Mason concluded that nothing in the *Hernandez* decision explained Begley's result or related it to governmental culpability.

Judge Mason's conclusions, if sound, might justify a requirement that an MPT test be conducted as a prerequisite to a suppression motion: in order to establish that any defect in the MPT was caused by the deficiencies noted in *Hernandez*, a defendant might be required to show that the MPT result was lower than the Intoximeter result in his or her case. It is not clear, however, that this rationale for requiring a retest of the MPT tube as a condition precedent to suppression supports Judge Andrews' actions in this case, because she was apparently prepared to suppress regardless of whether the retest result was higher or lower than the Intoximeter result, so long as the variance was greater than 15%.

6. On the other hand, Best may have misunderstood the thrust of Judge Andrews' decision. She may have intended her findings as illustrative of potential problems with the MPT, without meaning to condemn the system as a system. *See* discussion *infra*. If Judge Andrews assumed that a significant number of MPTs could yield accurate results, and this assumption is valid, then she could legitimately require a retest as a prerequisite to suppression. Judge Andrews should clarify the basis of her decision on remand.

owed by the governmental unit, not its individual agents. Thus, a finding that an individual police officer or other person administering a breathalyzer examination was free from fault, would not satisfy *Serrano* if it was established that the governmental entity, through antecedent negligence, had created a situation in which individual officers administering the test could not provide the defendant a means of verification.

Generally, a person asserting another person's negligence has the burden of proving it. We believe that there are some good reasons for departing from the general rule in this kind of case. First, as we pointed out in *Serrano*, in the typical case, the governmental agency will be in a position to furnish the defendant a basis for verification. 649 P.2d at 259. It is not unreasonable to require the governmental agency to establish that a particular case is not typical and justifies relieving it of the duty. Second, the circumstances preventing a governmental entity from complying with *Serrano* would be peculiarly within the knowledge of its agents. It is therefore not unreasonable to require it to establish its freedom from fault. We therefore conclude that a governmental entity seeking to excuse its failure to preserve a breath sample, or otherwise failing to enable a defendant to verify the results of a breathalyzer examination, has the burden of proving by a preponderance of the evidence its freedom from negligence.

*Id.* Since it was unclear whether the lower court had applied this standard we remanded for further proceedings. *Id.* at 111.

Judge Andrews did not have the benefit of our decision in *Flack* when making her ruling in *Hernandez*. As we stated in *Kerr*, 712 P.2d 400, at 406:

Under *Flack*, the defendant has the burden of showing that by virtue of some action or inaction on the part of the prosecuting authority, he was not furnished a reasonable means of verifying an adverse breath test result. He may show this by establishing either (1) that the means furnished were so generally and systematically defective that the results of an independent test should be inadmissible in evidence as a matter of law and without regard to the facts of his particular case; or (2) that the results of an independent test in his particular case were so inaccurate that they were worthless for the purpose of impeaching or verifying the original breath test results, regardless of whether the means furnished were generally yielding independent test results which were admissible in evidence. If the defendant succeeds in showing that the means furnished were systematically defective, he might not need to show, as a prerequisite to seeking suppression, that he attempted an independent test in his own case.

Once the defendant has sustained his burden of showing, that he was not furnished a reasonable means of verification, he has established a *prima facie* case that the breath test results should be suppressed. In order to avoid suppression, the governmental agency in question must then prove by a preponderance of the evidence that its failure to provide the defendant an independent means of verifying the result was free of fault.

We recognize that in the final section of her order in *Hernandez*, Judge Andrews stated that "in more than half of the cases the results are erratic, and the only source of error that has been discovered is due to inadequate preparation by the Municipality to assure proper collection of the separate sample." While this suggests application of the standard announced in *Flack*, it conflicts with earlier findings made by Judge Andrews regarding other sources of error. For instance, Judge Andrews concluded that the major sources of error were (1) "'improper collection technique' by insufficiently trained officers," and (2) "inadequately designed and maintained adaptors." *See* Appendix A, conclusion 6. (The adaptor is the metal device which connects the magnesium perchlorate tube to the Intoximeter, and through which the breath sample must pass on its way from the Intoximeter to the tube, *Kerr*, 712 P.2d

400, at 403–404). The first source might well be attributable to the municipality. However, Judge Andrews did not explore the question of whether the municipality was responsible for design and maintenance of the adaptor. Since the adaptors were selected by the state, it seems problematic to assign this second source of error to the municipality. *See Flack*, 685 P.2d at 110.[7] On remand, the court should attempt to identify each potential source of MPT error, and to determine whether the sources of error identified were in operation at the time Best's samples were collected.

The cases are REMANDED to the district court for further proceedings consistent with our opinion herein. If the court concludes that Best's Intoximeter results should have been suppressed, Best's convictions should be vacated.

MUNICIPALITY OF ANCHORAGE,

vs.

RAMIRO HERNANDEZ, JAMES C. COFFIN, CHRISTOPHER CORBAT, WILLIAM JARVINEN, YOHANNES MESFINE, WILLIAM J. WALKER, Jr., RALPH A ROLLINS, Jr., JOHN R. WALKER, WALTER R. THOMAS, WILLIAM M. DORN, Defendants

IN THE DISTRICT COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT

3ANM83–4629, 3ANM83–7647, 3ANM83–5906, 3ANM83–6552, 3ANM83–7714, 3ANM83–6278, 3ANM83–4981, 4982, 4983, 3ANM83–6720, 3ANM83–8320, 3ANM83–7186.

Motions to Suppress/Dismiss in the above captioned cases having been heard

before this court on February 7, 1984, and March 14, 1984, and the court having considered the written briefs as well as incorporated matters of record finds as follows:

FINDINGS OF FACT*

1. Prior to August 6, 1982 DWI arrestees were given a breathalyzer test to determine blood alcohol content.

2. As a result of the decision of the Court of Appeals in the matter of *Municipality vs. Serrano*, et al., 649 P.2d 256 (Alaska 1982), DWI arrestees were offered an independent blood test, paid for by the Municipality, to verify the accuracy of the breathalyzer result.

3. Subsequent to August 6th of 1982 and prior to July 1, 1983 the Municipality of Anchorage continued to give the defendant a breathalyzer test and offered an independent blood test at Municipal expense.

4. During the course of the *Serrano* litigation, the Court heard extensive testimony about "breath sample saving techniques". During the course of those hearings the District Court found, and the Appellate court confirmed, that breath sample preservation could be a reasonably efficient and effective means of assuring that breathalyzer results could be independently confirmed. The court noted however, that other methods of providing opportunities for independent testing might also satisfy the requirement of due process. *Serrano* at 258.

5. Subsequent to August 6, 1982 and prior to July 1, 1983 state and municipal prosecutors, in conjunction with the Department of Health and Social Services,

---

7. We express no opinion on the issue whether the negligence of the state could be imputed to the municipality or vice versa. Should the trial court's decision ultimately rest on imputed responsibility, the court's order should so reflect.

* Cites to the record include transcripts prepared in the matter of MA v. Vickie Lefferson et al., 3ANM83–5592, hearing before Judge Finn on November 28, 1983, (hereinafter referred to as *Lefferson* TR), the transcript prepared in the first hearing in the matter of Municipality vs.

Romero Hernandez, et al., 3ANM83–4629, hearing before Judge Andrews on February 7, 1984, (hereinafter referred to as the *Hernandez* TR), and matters of record not transcribed at the second hearing on March 15, 1984 in the matter of Municipality v. Hernandez (hereinafter referred to as *Hernandez,* using log note cites.) and finally, a partial transcription prepared in the matter of Municipality v. Hautanan heard before Judge Finn on December 5, 1983 (hereinafter referred to as *Hautanan* TR.)

began to focus on certifying a technique for the collection, preservation, and re-testing of preserved breath samples.

6. From approximately February of 1983 through May of 1983 Mr. Everett J. Clary, as a chemist for the Department of Health and Social Services, working at the State Trooper Crime Lab, performed numerous tests with the Intoximeter instrument and the breath saving procedures using perchlorate tubes.

7. Those tests resulted in a high correlation between a known alcohol sample and the amount of alcohol found in the perchlorate tube. *Hernandez* TR 175, *Lefferson* TR 113–120.

8. The Intoximeter, the most technologically advanced and approved instrument for breath testing, has been certified for use in Alaska. The Intoximeter can be adapted to provide for the collection of an independent sample of the breath which has been analyzed by the machine. *Hernandez* TR 223, *Lefferson* TR 120.

9. The adaptation which allows for the recapture of analyzed breath in the machine consists of an L-shaped threaded device, hereinafter referred to as an adapter. In addition to the adapter there exists a perchlorate tube. It can be roughly described as a 8-inch hour-glass shaped glass tube. The center of the hour glass tube is filled with a white powdery substance, perchlorate, which is packed tightly into place with wads of cotton. A removable plastic seal is inserted into each end of the perchlorate tube and a black plastic cap is screwed onto each end of the perchlorate tube. *Lefferson* TR 10–12.

10. In order for an Intoximeter operator to obtain a separate breath sample, the operator must unscrew the plastic black caps, remove the plastic inserts, screw the glass tube into the threaded portion of the adapter and plug the flanged portion of the adapter into the Intoximeter machine. The operator then presses a key on the Intoximeter which allows the tested breath to escape through the perchlorate tube. Perchlorate traps the alcohol. *Lefferson* 10–12.

11. The operator then must unplug the adapter, unscrew the glass tube from the adapter, re-insert the plastic seals and re-cap the ends of the tube with the plastic threaded caps. This must be done in a expeditious manner to reduce potential contamination. The preserved sample is then marked and entered into evidence. *Hernandez* TR 76.

12. Between approximately April and June of 1983 the Anchorage Police Department set up training sessions to educate their officers to enable them to be certified as Intoximeter operators. During that period of education and certification there were very few perchlorate tubes available as the initial lot which had been sent was contaminated and had to be returned for decontamination. *Hernandez* TR 62.

13. During the course of their training, officers were required to operate the Intoximeter in a manner which proved that they could reach a known target. Officers were not given an opportunity to learn to collect a second breath sample as there were insufficient numbers of perchlorate tubes available to provide for "hands on" training. Officers were certified without any procedure that required them to prove that they could obtain a second breath sample which would meet a known target. *Hernandez* # 2 62, 90–98.

14. There was a push to get the Intoximeters with their perchlorate tube adaptation devices on line for the 4th of July weekend, 1983. *Hernandez* 186, 208.

15. There was no legal mandate requiring the institution of any particular method of breath saving techniques, nor was there any time deadline set by the Court of Appeals.

16. No field testing, whatsoever, was done with regard to the independent breath saving technique of perchlorate tube collection which was put into operation on or about July 1, 1983. *Hernandez* 223, *Lefferson* 119, 144–145.

17. When the perchlorate tubes were used, the Municipality of Anchorage ceased

providing independent blood samples. Pursuant to the requirements of statute, the Intoximeters were calibrated every 15 days. There was an adequate quality control program in existence and rigidly maintained to assure the continued accuracy of the Intoximeter machines.

18. There was no quality control program, no recorded regular method of inspection, no method devised to review or monitor the separate sample collection components of the Intoximeter. *Hernandez* TR 65–92.

19. In approximately August of 1983, about one month after machines had been in operation, Officer Turner Pippin, the supervising calibration officer, noticed that portions of the plastic inserts which should have been placed in the ends of the perchlorate tubes were lying around the Intoximeter machine. They had been cut up in a manner which resulted in the "jury rigging" of a plastic O-shaped ring. *Lefferson* TR 17, *Hernandez* 56.

20. Upon further inquiry Officer Pippin determined that the officers were using these plastic O-rings to replace O-rings of a similar type which had fallen out of the threaded end of the adapters and been lost. *Hernandez* 56.

21. The "jury rigged" O-rings were used for a short while, Officer Pippin finding that it seemed to be a "good fit for the short term". *Hernandez* 69.

22. At any one time there were three to five adapters which could be used. None of them were marked or identified. *Hernandez* TR 84–85.

23. Over a period of time Officer Pippin noted that the flanged portions of the adapters were coming loose, that some adapters had broken threads, and that they were deteriorating from wear and tear. At some point, perhaps as early as August or September of 1983, Officer Pippin learned that in addition to the adapter wear and tear problems and the O-ring problems, that some officers were failing to check for O-rings, (whether originally supplied or "jury rigged") in the adapters; that some

officers were failing to take off the plastic inserts from the ends of the tube, and that some officers were failing to remove the plastic black outer caps from the tubes prior to testing. *Hernandez* 81, 88–89.

24. As these problems became known Officer Pippin tried to "catch each guy that we could find making a mistake and tried to teach him separately". He also placed handwritten notes on the wall above the breathalyzer about problems and ways to correct them when he was alerted to those problems. In early February of 1984 Officer Pippin's wife volunteered to make posters which were placed in the Intoximeter room to provide a more reliable method of information to the officers. *Hernandez* TR 56–58.

25. At some unknown time the original adapters were replaced with new adapters. *Hernandez* TR 57–58.

26. Those new adapters have subsequently been changed. From July of 1983 to present the adapters have changed from plastic to metal to nylon. *Hautanan* 216.

27. No systematic retraining or reeducation of Intoximeter operators was instituted at least through March of 1984. *Hernandez* 218–222.

28. A procedure has been developed to allow for the extraction of alcohol from the perchlorate tube in such a manner that the amount of alcohol trapped within the perchlorate relates back to the Intoximeter result within a 5% correlation. Everett Clary, in lab testing, has been able to obtain consistent and reliable results on perchlorate tube re-testing by exposing the perchlorate to a known sample of alcohol and obtaining the same result from the perchlorate. *Hernandez* 175–208.

29. In his most recent studies Mr. Clary, in re-testing field-collected perchlorate samples, has been able to determine that slightly more than half, that is, 11 out of 21 samples, accurately correlated with the Intoximeter result. The remaining 10 samples either had no alcohol trace or were consistently 60–70 percent lower than the

intoximeter result. *Hernandez* TR 175–180.

30. In another sample of approximately 30 cases obtained from a controlled field study from Juneau, Mr. Clary was able to obtain, on the average, results within 6 percent of target values. *Hernandez* log notes 2862–2877.

31. In the opinion of Mr. Clary, the perchlorate method of breath sample preservation is at a workable stage, and the inability to achieve consistent correlation between the preserved sample and the Intoximeter result is the result of "operator mishandling". Operator mishandling, as defined by Mr. Clary, falls into two broad categories: "hardware" problems and officer certification and education. *Hernandez* 191, 214–222.

32. Mr. Clary found that the adapters which he used in his lab have not proven to be reliable in the field. *Hernandez* TR 216.

33. Mr. Clary stated that the original education and certification of the officers was done with perchlorate tubes that had a different cap and no plastic inserts. The perchlorate tubes which were actually put in use contained plastic inserts and different plastic caps. *Hernandez* TR 217.

When it came to his attention that the officers were not taking out the plastic inserts and in some cases not removing the plastic caps he immediately notified all of the law enforcement stations of the problem. *Hernandez* TR 218.

34. None of the changes in hardware described above have been reviewed for any form of recertification for acceptability by the Department of Health and Social Services. Mr. Clary has encouraged Health and Social Services to require each operator to perform a perchlorate test against a known standard as a type of certification of the adapter, the instrument and the officer. Mr. Clary testified that the work which has been done to date is "developmental" as the methodology has not been previously found reliable in the field elsewhere. *Hernandez* TR 214–222.

35. With regard to operator error, Mr. Clary testified that he was "flabbergasted" with the sloppy collection methods. He indicated that no checklist was provided to the officers as it appeared to be a simple straight-forward procedure. He became aware of the collection problems in November of 1983. *Hernandez* TR 214.

36. Dr. Rogers, a pathologist from Humana Hospital, and one of the co-directors of the private lab which performs the retest on perchlorate tubes, testified that the perchlorate breath sample method of collection has potential for working but it has not been working up to now. *Hernandez* TR 129.

37. Dr. Rogers testified that either APD officers must be vigorously retrained to be meticulous about the method of collection or APD should hire a lab technician to assure that the collection method more closely adheres to the necessary laboratory standards. *Hernandez* TR 137.

38. Dr. Propst, a pathologist from Humana Hospital, testified to essentially the same conclusion reached by Dr. Rogers—that the present method, with its attendant field collection problems, is not a scientifically reliable method of preserving an independent breath sample. *Hautanen* TR 8.

39. Both Dr. Rogers and Dr. Propst testified prior to rehearing in this matter on March 15, 1984.

40. Testimony was re-opened on March 15. At that hearing Jill Booth, the lab technician who actually ran the gas chromatigraph retesting of the perchlorate tubes, testified that she used an erronous number in calculating the results of the re-test. Instead of a .10 standard against which results were tested, the known solution was probably between .169 and .175, resulting in a 40%–42% erroneously low reading on all the test results obtained between November 29, 1983 and February 9, 1984. *Hernandez* log notes 3196–3392.

41. The re-calculated results are included in appendix A. They are the re-calculated results of each test performed on the

perchlorate tube of each individual. The re-calculated result is the average of all the tests on each sample. Ms. Booth and Mr. Clary agreed that the re-calculated number would bring one 40 to 42 percent closer to the true value, but that there could be no greater refinement of the results due to the inability to determine the source of any other error. Hernandez log notes 2960–2980, 3196.

42. In addition to the erroneous calculation performed by Jill Booth, Mr. Clary determined that there were two other possible sources of error in the retesting procedures used by Humana Hospital: first, inadequate salination of the perchlorate solution resulting in less gas or head space to analyze. Second, the lab technician's failure to use a glass syringe and failure to heat that syringe each time after the gas was extracted from the perchlorate capsule and injected into the gas chromatograph may have resulted in some "carry over" alcohol-tainted gas between each test. *Hernandez* log notes 2584–2636.

43. Mr. Clary stated that because of the erroneous procedures used to obtain the "recalculated" results, there is no ability to recalculate a true result. *Hernandez* log notes 2568–3159.

44. The procedures used by Humana Hospital to re-test perchlorate tubes were developed by Mr. Clary, an employee of the State Troopers. The procedures did not clarify the precise method of salinization or reheating of glass syringes. *Hernandez* log notes 3041–3104.

45. Humana Hospital is the only hospital or lab in Alaska presently performing perchlorate tube analysis.

## CONCLUSIONS

1. The Intoximeter 3000 is an accurate breath alcohol testing device.

2. The perchlorate method of separate breath sample preservation has been found to be an accurate method of collection in a controlled laboratory setting.

3. The gas chromatograph re-testing procedure employed by Mr. Everett Clary has established that perchlorate breath samples, properly preserved, can be accurately re-tested within acceptable limits of accuracy.

4. Based on the tolerance level of the Intoximeter (plus or minus 10%) and the tolerance level of the gas chromatograph re-testing procedure (5 to 7 percent), an analysis of the perchlorate sample which yields a result within 15% plus or minus of the Intoximeter result falls within the reasonable range of acceptability and reliability.

5. Less than half of the field collected perchlorate tubes have yielded results within 15 percent of known Intoximeter values.

6. The most significant source of error appears to be from two sources. First, improper collection technique utilized by insufficiently trained officers. Second, inadequately designed and maintained adapters used for the perchlorate tube collection process.

7. The re-testing protocol for the perchlorate tubes appears to be adequate and will yield results within tolerance if the separate breath sample is properly collected.

8. Due to the fact that the collection technique differed from officer to officer and that no quality control data is available on the use of any particular adapter or the quality of that adapter, it is impossible to pinpoint with any exactitude the source of the error.

9. Due to the fact that the protocol for retesting, supplied by the state was inadequate, the results of retests performed by Humana Hosp. through Feb 9 cannot be "rehabilitated" so that the court can determine whether or not the re-test result falls within the 15% range of acceptability.

## DISCUSSION

As a result of the decision in the matter of *Municipality vs. Gilbert Serrano,* 649 P.2d 256, the Appellate Court concluded that the due process clause of the Alaska Constitution requires the prosecution to make a reasonable effort to preserve the

breath sample or to take steps to allow a defendant to verify the results of the breathalyzer test. The Court found that because both state statute and city ordinance place great emphasis on the breath test by making it an offense to drive a car with a .10 or more breath alcohol, the ability of the defendant to cross-examine these test results is critical to his case and the integrity of the criminal justice system. The wisdom of the Appellate Court's decision is obvious when one looks at the practical application. A suspected intoxicated driver whose test result is a .10 on the Intoximeter can be convicted upon sufficient proof of that fact. If the Intoximeter can be proven to be erroneous by one-one hundreth of a percent such that the Intoximeter should properly have read .09, then the defendant cannot be convicted of driving with .10 or more breath alcohol although he may be convicted of driving under the influence with that level of blood alcohol. The inability of the defendant to prove that the machine was operating within tolerable limits of accuracy is important and cannot be discounted on the theory that the Intoximeter is almost always accurate.

Prior to the introduction of the perchlorate preservation method the Municipality of Anchorage, in compliance with *Serrano,* offered defendants the opportunity to preserve an independent test by providing them with the opportunity to have a blood test to determine the alcohol content of their blood. The blood alcohol test is a routine laboratory test which yields results, usually higher than a breath alcohol test, and has been accepted as reliable by the courts. The new technique introduced by the Municipality in July of 1983 appears to have been a reasonably accurate substitute for the blood test. However, it was never field tested to determine that it would provide, in fact, a reasonably accurate independent check of the Intoximeter result.

The Municipality claims, in its argument and through its witnesses, that they could not perform field testing of the technique on actual arrestees as the perchlorate sample was the defendant's evidence. A.S. 28.-35.031, the Implied Consent statute, states that a person who drives has impliedly consented to a "chemical test or tests" of his breath. It is fairly obvious to this court that the Municipality could have continued to offer the independent blood samples while collecting perchlorate tubes and testing them for inaccuracy. The Municipality failed to take any precautionary measure whatsoever to assure that the perchlorate method would work in the field. The court, in *Serrano,* set no requirement that perchlorate tubes be used. It is clear to this court that the Municipality, in its attempt to provide for a less expensive, more efficient method of an independent sample, introduced a method which had not been properly tested to assure its reliability and provided no backup testing while the method's reliability could be determined.

Perchlorate sample preservation is capable of becoming a technologically sound, efficient and effective method of breath preservation. It has not yet reached that point. The method of preservation and retesting often yields accurate results, and to the extent that the results of the re-test are accurate within 15% of the Intoximeter, this Court finds no basis on which to suppress the Intoximeter or re-test results. However, in more than half of the cases the results are erratic, and the only source of error that has been discovered is due to inadequate preparation by the Municipality to assure proper collection of the separate sample. To allow the Municipality to explain away the wildly erratic re-test results by detailing the negligent collection of the sample by untrained police officers and inadequate hardware being used to collect the sample would be patently unfair and deny the defendant his right to effective cross examination. For that reason the Intoximeter and re-test results will be suppressed in the above captioned cases.

DATED at Anchorage, Alaska, this 17 day of April, 1984.

/s/ Elaine M. Andrews
Elaine M. Andrews
District Court Judge