**William R. SKAMAROCIUS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–1068.**

Court of Appeals of Alaska.

Jan. 9, 1987.

Charlene A. Lichtmann, and Fred H. Valdez, Anchorage, for appellant.

Nancy R. Simel, Asst. Dist. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

A jury convicted William Skamarocius of sexual assault in the second degree in violation of AS 11.41.420. He appeals, challenging the exclusion of expert testimony regarding problems in evaluating the accuracy of eyewitness testimony. We reverse.

## FACTS

P.P. is a real estate agent. On November 3, 1984, she was holding an open house at a condominium, hoping to show it to potential purchasers. At 2 p.m., a man stopped by and she showed him the property. They first went to the garage where she introduced him to two other visitors, Roberta Storo and Mr. Bradley. P.P. and the man then went upstairs where he unexpectedly attacked her. P.P. struggled with

the man which resulted in his beating her about the face. Eventually, the man succeeded in pulling down her pants and making sexual contact. The assailant then broke off the assault and fled the premises. In hysterics, P.P. ran down the stairs and reported the assault to Storo and a neighbor, Lyman Woodman, who called the police.

P.P. was with her assailant for approximately seven minutes before he attacked her. She estimated that they struggled for ten to fifteen minutes. She described him as being dressed in a grey jogging outfit, a blue knit hat, which covered his hair and ears, and wearing a cream-colored towel around his neck and distinctive white running shoes with black soles. P.P. said her assailant had wide-set jaws, fair skin, was clean shaven and "kind of chubbyish," and estimated that he was twenty-eight to thirty years old, five foot ten inches tall, and weighed 185–190 pounds.

Several weeks after the incident occurred, the police showed P.P. a photographic lineup, but she was unable to identify anyone. Later, on February 13, 1985, she was shown a second photographic lineup, which she was told contained the picture of a man who had been bothering women at the University of Alaska. She examined the six photographs provided by the police and picked out Skamarocius as her assailant. P.P. told the police that she was ninety percent certain that he was the one but wished either to see a more current photograph or find another way for her to identify him in order to be even more certain.

Officer Weeks of the Anchorage Police Department told P.P. that the man whose photograph she picked was the one that the police suspected was causing trouble at the University and that they scheduled him for an interview on February 15, 1985, at the University to inquire about these problems. The officer asked P.P. if she wished to go to the University at the scheduled interview time to observe Skamarocius firsthand. P.P. agreed and went to the University, where she met Officer Weeks. She and Weeks waited in the lobby until Skamarocius arrived. She testified that Skamarocius saw her and walked over to where she was sitting, looked intently at her for a few moments, and then walked away and sat down. P.P. positively identified Skamarocius as her assailant at this time.

Based upon P.P.'s identification, the police obtained a search warrant for Skamarocius' residence where they found a towel similar to the one described by P.P. They also seized some jogging clothes similar to those P.P. described. When P.P. was shown the property obtained through the search warrant, she did not recognize the clothes and could not positively identify the towel.

P.P. also identified Skamarocius, as her assailant, at the trial. She testified that the towel found by the police looked like the one used by her assailant. Storo corroborated P.P.'s testimony about being beaten, but she could not positively identify Skamarocius as the man she saw with P.P. that day. The prosecutor also established that Skamarocius closely fit the initial description that P.P. gave the police the day she was assaulted: white male, thirty years old, 180 pounds.

Skamarocius denied assaulting P.P., and said he never saw her before the first day of trial, and had no recollection of having seen her at the University on February 15. His defense was alibi. He testified that he was a student at Anchorage Community College studying computer programming. He stated that he spent the afternoon of November 3, 1984, at the computer lab. His testimony was corroborated in part by the testimony of Marion Guerin, who was in charge of the computer lab, and who testified that Mr. Skamarocius, as a student, was allowed to use the computers. The computer records showed that on Saturday, November 3, 1984, Skamarocius' account was logged on at 12:59 p.m. and logged off at 7:28 p.m. Mr. Guerin conceded that there was no way of knowing if Skamarocius was there the entire time, since he could have logged on, left, and

then returned later. On rebuttal, the state offered testimony that the condominium where P.P. was attacked was a ten-minute walk from the computer lab at the college.

In order to bolster the defense, Skamarocius sought to introduce the expert testimony of a psychologist, Dr. Robert Madigan, to testify about certain factors that can make eyewitness testimony unreliable. Specifically, Dr. Madigan was to testify to the deterioration of memory over time, the danger that subsequent events would become inseparably incorporated into a memory of an earlier event, the danger that a traumatic event might distort rather than impress an event in a person's memory, and the fact that an individual's confidence in his or her memory of an event may be unrelated to its accuracy.

The state initially objected to Dr. Madigan's testimony on the ground that the defense had not given the advance notice of an intent to rely on an expert, which Alaska R.Crim.P. 16 requires. The trial court sustained this objection and precluded the defense from calling Dr. Madigan for twenty-four hours to enable the prosecutor to interview him, prepare for cross-examination, and rebuttal. It appears that the prosecution considered this a reasonable time. The prosecutor mentioned that he was familiar with the literature regarding eyewitness identification, and had on previous occasions cross-examined Dr. Elisabeth Loftus, a leading authority. The defense then made an offer of proof consisting of Dr. Madigan's entire testimony on direct. The state briefly cross-examined, and then objected again to any testimony by the defense expert. However, it did not repeat its claim of surprise, implicitly conceding that an effective cross-examination and rebuttal might be prepared in the time made available by the court. Instead, it argued two points: first, that testimony about problems with eyewitness identification invaded the province of the jury; and second, that the testimony was based on laboratory experiments with students, not rape victims, which therefore could not help a jury evaluate the testimony of a person admittedly attacked by another.

Judge Carlson sustained the state's objection to the expert testimony.[1] He ruled:

All right. The—Doctor Madigan will not be permitted to testify, because I find that his testimony would create confusion. It's less probative than prejudicial. It's irrelevant. The issue of memory processes will overcome the main issue in the trial. And it's even less relevant than polygraph information, which we have determined not to allow, and the primary reason is, however, it would emphasize something which is not the chief point in the trial, and therefore he will not be permitted to testify.

Judge Carlson also directed the defense to refrain from commenting on psychological studies regarding memory and their relevance to eyewitness testimony. In final argument, the state stressed that P.P. was positive she had accurately identified Skamarocius as her assailant and argued that the identity of an attacker is seared into the victim's memory so that she will remember his appearance until the day she dies. The defense argued mistaken identity, reasoning that Skamarocius was the only person whose photograph the police showed P.P. that looked anything like her initial description and thereafter she merely identified the photograph she had seen rather than the person who had attacked her three months earlier.

## DISCUSSION

Whether to permit an expert witness to testify is a question committed to the sound discretion of the trial court, which is reviewable only when it abuses this discretion. *Handley v. State*, 615 P.2d 627, 630 (Alaska 1980); *Lewis v. State*, 469 P.2d

---

1. The trial court did not hold and the state has not contended that Skamarocius' late disclosure of his expert witness prejudiced the state or independently justified exclusion. *See* Alaska R.Crim.P. 16(c)(4) and (e). We will therefore not address that issue. *Cf. Best v. Anchorage*, 712 P.2d 892, 895 (Alaska App.1985) (appellate court will not affirm denial of motion on grounds of untimeliness unless trial court denies motion on that basis).

689, 695 (Alaska 1970). A trial court abuses its discretion when the reasons for the exercise of discretion are clearly untenable or unreasonable. In this case, we are satisfied that the trial court did abuse its discretion, and since the excluded testimony was central to Skamarocius' defense, we are unable to say that its exclusion did not appreciably affect the jury's verdict. Thus the error cannot be considered harmless and Skamarocius is entitled to a new trial. *Love v. State,* 457 P.2d 622 (Alaska 1969).

We addressed a similar issue in *State v. Contreras,* 674 P.2d 792 (Alaska App.1983), *rev'd on other grounds,* 718 P.2d 129 (Alaska 1986). We said:

> A trial judge clearly has the authority to permit expert testimony from a knowledgeable psychologist or other qualified expert on eyewitness susceptibility to memory distortion ... if the testimony is based on information not generally understood by lay people sitting on juries. *See* A.R.E. 401; A.R.E. 702; (other citations omitted). Where the evidence regarding an identification is weak and uncorroborated or sharply disputed, it may be an abuse of discretion to exclude such testimony.

674 P.2d at 822.

A number of recent decisions are in agreement. *United States v. Downing,* 753 F.2d 1224, 1226 (3rd Cir.1985); *United States v. Smith,* 736 F.2d 1103 (6th Cir. 1984), *cert. denied,* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). *See State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984); *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795 (1986), *cert. denied, Buell v. Ohio,* —— U.S. ——, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986).

The state offered two justifications for excluding the evidence: (1) it would invade the province of the jury; and, (2) it would address generalities rather than the specifics of P.P.'s identification. We find both reasons untenable. The first has been rejected a number of times. *See Handley,* 615 P.2d at 629–30 n. 8. The rejection has now been codified. *See* A.R.E. 704. *See also McDonald,* 208 Cal.Rptr. at 249–50, 690 P.2d at 722–23. The second reason supports admission rather than exclusion. *See* A.R.E. 704 Commentary at 197; *Chapple,* 660 P.2d at 1219; *McDonald,* 208 Cal. Rptr. at 246, 690 P.2d at 719.

Judge Carlson offered two additional reasons why the evidence should be excluded. One reason was that the evidence was akin to polygraph evidence and, therefore, implicitly violated the rule of *Frye v. United States,* 293 Fed. 1013 (D.C.Cir.1923). *Frye* was recently reaffirmed in this jurisdiction. *See Contreras v. State,* 718 P.2d 129, 134–36 (Alaska 1986). The second reason was that the testimony would distract the jury's attention from the main issue in the case.

■ We are satisfied that Dr. Madigan's testimony was sufficiently within the mainstream of current psychological theory to satisfy the *Frye* test. *See McDonald,* 208 Cal.Rptr. at 250–53, 690 P.2d at 723–26. *Compare Downing,* 753 F.2d at 1232–37. We are also satisfied that the testimony was germane to the main issue in the case: the accuracy of P.P.'s identification of Skamarocius as her assailant. The defense conceded that P.P. had been assaulted by someone and the evidence on this point was overwhelming. The only issue in dispute was the accuracy of her identification of the defendant. Dr. Madigan's testimony would have been helpful to the jury in this regard. The prosecutor supported the accuracy of P.P.'s identification by relying heavily on the common sense assumptions that P.P. was confident in her identification and that a person subjected to a sexual assault would have her assailant's image branded into her memory. Dr. Madigan's testimony could have undermined both of these common sense assumptions. In addition, his testimony would have helped the jury evaluate the significance of the almost three months that elapsed between the assault on November 3, 1984, and P.P.'s first identification of the defendant on February 15, 1985. Judge Carlson abused his discretion in excluding the testimony.

The defendant's identity as the perpetrator of an offense is always an element of the crime. However, it will not always be necessary to allow an expert to testify regarding eyewitness testimony. The defendant may concede identity and defend on other grounds. He may have confessed, conceding identity, or have been apprehended in the commission of the crime, or in possession of the victim's property. In such a case, the trial court might properly conclude that "identity" is only marginally in issue and act within its discretion in precluding expert testimony. It is also possible that rejection of expert testimony might in some cases be harmless error where identity is sharply contested.

█ A number of courts have found the exclusion of similar evidence harmless. Such findings have been made where the identification is corroborated: by substantial physical evidence (*see Buell*, 489 N.E.2d 795 (Ohio 1986)); or, by a codefendant's confession (*see People v. Plasencia*, 168 Cal.App.3d 546, 214 Cal.Rptr. 316, 320–21 (1985)). In such cases, we too might have been inclined to find harmless error. Here, however, the only corroboration for P.P.'s identification was Storo's testimony and the towel found by the police at Skamarocius' home. Since Storo could not positively identify the defendant, and P.P. could not positively identify the towel, we cannot conclude that exclusion of the defendant's expert testimony was harmless. Skamarocius is therefore entitled to a new trial.

█ Skamarocius raises three other related issues which may arise at retrial and should therefore be addressed in this opinion. First, he contends that the initial photographic lineup was suggestive. We have examined the pictures in question and conclude that the trial court did not abuse its discretion in rejecting this argument. *Tookak v. State*, 648 P.2d 1018, 1021–22 (Alaska App.1982). We are satisfied that the reliability of P.P.'s identification was properly left to the jury. *See Walker v. State*, 652 P.2d 88, 95 (Alaska 1982) (discussing method for determining the reliability of an eyewitness identification).

█ Skamarocius next challenges the admissibility of the February 15 showup at the University. We are satisfied that the reliability of P.P.'s identification was for the jury to decide. *See Vessell v. State*, 624 P.2d 275, 279 (Alaska 1981). These conclusions obviate further consideration of defendant's third argument that the in-court identification was impermissible. *See Viveros v. State*, 606 P.2d 790, 793 (Alaska 1980).

The judgment of the Superior Court is REVERSED.

COATS, Judge, dissenting.

This case turns on identification of the defendant by a single eyewitness. I concur that appropriate expert testimony might have been of use in this case. However, the expert witness, Dr. Robert Madigan, conceded that his testimony was based upon studies in which people from the academic community were shown pictures and were then later tested on how well they remembered the pictures. He conceded that a situation where a person was subjected to an attempted rape would be very different. In short, Dr. Madigan never appeared to make a significant connection between the eye witness problems presented in this case and the studies about which he testified. Thus, I am not convinced that Dr. Madigan's testimony would have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue...." A.R.E. 702. On this basis, I conclude that the trial judge did not abuse his discretion in excluding Dr. Madigan's testimony. I therefore dissent on this issue.