OPINION OF THE COURT
Joseph Harris, J.
The issue presented by the motion of the defendant is whether the results of a breath test performed on an Intoximeter 3000, a device employing infrared and electri *688 cal analysis of breath vapors, are admissible as evidence in a prosecution for driving while intoxicated.
A suppression hearing was held at which this court heard testimony from one of the developers of the instrument, from an official of the Bureau of Municipal Police in the New York State Division of Criminal Justice Services, from a project director for the breath-alcohol program of the United States Department of Transportation involved in the evaluation of breath-alcohol test devices for the National Highway Traffic Safety Administration and, for the defendant, from a professor of chemistry at the State University of New York at Albany.
This is a case of first impression and may be of broad impact throughout the State of New York; thus a full exposition of the issues and their resolution is required.
FINDINGS OF FACT
The Intoximeter 3000 is a breath-testing device which utilizes infrared energy and electrical current to detect the presence of ethyl alcohol (ethanol) in the breath of a driver. The device, as are all breath-testing devices, is based upon Henry’s law[1] and, unlike the more common breath testers such as the breathalyzer, upon the Beer-Lambert law of absorption.[2]
*689 The Intoximeter 3000 is equipped with an infrared energy source of nichrome (an alloy of nickel, chromium and iron) surrounding a ceramic core. An electric current passing through this source causes two beams of infrared energy to be emitted in the direction of a two-chambered gas cell after reflecting off a collimating mirror. After traversing the gas cell, the infrared beams pass through a narrow-band interference filter. This filter permits infrared energy with a wavelength ranging from 3.3 to 3.48 microns to pass through and strike a detector while at the same time blocking energy with wavelengths greater or lesser than that range. Thus the beam of energy striking the detector is modified so that it corresponds to one of the major absorption bands of ethyl alcohol.
The cell through which the infrared beams pass has two chambers. One, the reference cell, contains only room air. The other, the sample cell, contains during a test 900 cubic centimeters of the subject’s alveolar air. The device gives a *690 reading of the amount of interfering substance[3] in the subject’s breath by comparing the amount of infrared energy striking the detector after the two beams pass through the chambers, one through the sample cell, the other through the reference cell. Otherwise stated, the device compares the amount of infrared energy absorbed by the air from the lungs of the subject with the amount absorbed by the air from the room. If the ratio resulting from that reading (energy absorbed by the alveolar air/energy absorbed by the room air) is greater than one, there is present in the subject’s breath some substance which absorbs infrared radiation at 3.39 microns. The amount of interfering substance present is determined by the amount of infrared energy it absorbs. At this point it is impossible to conclude that the absorbing substance is ethyl alcohol because in addition to ethyl alcohol there are other substances which absorb radiation at 3.39 microns.
In order to enable the Intoximeter 3000 to give a specific reading for ethyl alcohol, another device is necessary. Thus the Intoximeter 3000, in addition to its infrared analysis of breath based on the Beer-Lambert law of absorption, also contains a semiconductor (a Taguci sensor) by which it is able to distinguish ethyl alcohol from other substances which absorb infrared radiation in the area of 3.39 microns.[4]
The Taguci sensor is a semiconductor device the conductivity of which is influenced by the ambient air in the sample chamber. The conductivity of the semiconductor varies when there is present in that ambient air an oxidizable vapor such as ethyl alcohol or other hydrocarbon. Programmed into the memory of the computer that is mated to the Intoximeter 3000 are the specific conductivity readings (in amperes) of the sensor when ethyl alcohol is present in the sample chamber at varying levels which correspond to the various blood-alcohol levels. These conductivity readings are predetermined empirically in the *691 laboratory, and are specific for ethyl alcohol. Every other substance that absorbs infrared radiation at a wavelength of 3.39 microns produces a different current in the semiconductor. The computer incorporated into the device compares the outputs from the infrared sensor (amount of infrared energy absorbed) and the semiconductor (amperes of electrical current). If the semiconductor reading does not correspond to that stored in the computer’s memory for the blood-alcohol level reported by the infrared sensor, an interferent other than or in addition to ethyl alcohol is present in the subject’s breath. The computer performs a calculation to determine the difference between the reading for the blood-alcohol level reported by the infrared sensor and the reading from the semiconductor sensor, which difference automatically reduces the infrared reading by a corresponding amount. That adjusted amount is reported as the subject’s blood-alcohol level.[5]
Operation of the Intoximeter 3000 is relatively simple and requires minimal operator intervention compared with more common breath-testing devices.
Each test commences with a 20-minute waiting period during which the subject is observed to insure that he does not ingest any alcohol, regurgitate or vomit. The operator presses a “start” button and then follows the machine’s commands to enter his name and identification number and the subject’s name. Following the last entry, the machine automatically blanks and purges to remove any residual alcohol fumes and to take a baseline reading, which ought to read “.00.” The machine then commands the subject to blow into the breath tube until the machine *692 indicates that a sufficient sample has been entered. The Intoximeter then reports the subject’s blood-alcohol content on its display and proceeds to purge and blank itself. The machine then automatically runs a test with a reference solution, the ethyl alcohol content of which has been previously certified by the State Police laboratory. Following the test with the reference sample, the machine again purges itself. The operator then presses the “print” key, whereupon the information previously entered and the results of the subject’s test, the reference sample test and the blank tests, the latter two being control tests to assure that the machine is functioning properly, are printed along with the times that the tests took place. The operator thus is required merely to type certain minimal information on the machine’s keyboard; he does not have to handle ampules of chemicals nor turn dials and levers as with more common breath-testing devices.
The machine automatically safeguards against any contaminants in the room air and contains fail-safe devices to abort if there are room temperature or electrical or voltage problems, which rarely occur.
CONCLUSIONS OF LAW
Counsel for the defendant makes two threshold arguments. First, that sections 1193-a and 1194 of the Vehicle and Traffic Law permit only a “chemical test” of the breath, blood, urine, or saliva of a motor vehicle operator for the purpose of determining the alcoholic or drug content of his blood.
*693 The defendant argues the Intoximeter 3000, based as it is on infrared and electrical analysis of a driver’s breath, is not a “chemical test” and thus the results of such test are inadmissible.
The defendant’s position is unrealistic and unfounded. There is no precedent in the State of New York on this issue, but a similar argument was made and rejected in courts of other States with regard to the Omicron Intoxilyzer (another breath-testing device, utilizing infrared theory). In Ohio, a court held that even though the infrared test did not involve an actual chemical reaction, the definition of chemical analysis was broad enough to embrace the infrared process (City of Dayton v Schenck, 63 Ohio Misc 14). Similarly, in Delaware, the court held that the Intoxilyzer did perform a chemical analysis as required by State law regardless of the fact that the procedure was purely mechanical. The court concluded the term “chemical test” meant only an “analysis” of the substance being tested — that is, an examination of a substance to determine its component parts and proportions thereof, regardless of the method of testing (State v Moore, 307 A2d 548 [Del]). This court likewise concluded that the term “chemical test” as used in sections 1193-a and 1194 of the Vehicle and Traffic Law was intended to mean an analysis of the chemistry of the substances therein referred to — breath, blood, urine or saliva — to determine the subject’s blood-alcohol content, and was not intended to refer to the method of testing. Thus an analysis of breath as performed by the Intoximeter 3000, which utilizes established principles and laws of physics, is a chemical test within the meaning of that term in sections 1193-a and 1194 of the Vehicle and Traffic Law. The position advanced by defendant seeks to restrict the meaning of “chemical test” to a process more appropriately called a chemical reaction. There is no authority in the law to require defendant’s interpretation. Furthermore, to adopt the defendant’s position would be to bind inflexibly the administration of justice to the level of technology extant at the time of the enactment of the statute while technological advances thereafter would be unavailable to law enforcement officials if they did not fall *694 within the terminology of a dated statute. If such a result is not required, it ought not to be adopted.
The defendant’s second threshold argument is that the results of the Intoximeter test are inadmissible because the instrument has not been certified or tested by the New York State Department of Health nor has it been listed by the director of the State Police laboratory as a device which meets the criteria of the Department of Health, both of which preconditions, the defendant argues, are required by subdivision 9 of section 194 of the Vehicle and Traffic Law.
This court finds nothing in subdivision 9 of section 1194 mandating the Department of Health to establish criteria for breath-alcohol testing devices, let alone conditioning the evidentiary admissibility of the test results of such devices upon their conformance with such criteria. Subdivision 9 of section 1194 of the Vehicle and Traffic Law is concededly inartfully drawn, but in this court’s view its obvious intent and purport were to establish a procedure for issuing permits to qualified test operators so as to establish a presumption that the test was properly given and thus ease at trial the People’s burden with respect to establishing a foundation at trial for the admissibility of breath-alcohol test results. Interestingly the subdivision in question specifically provides that it does not prohibit the introduction as evidence of an analysis made by an individual not possessing a permit issued by the Department of Health.
The fact that the Department of Health saw fit to promulgate “regulations”, contained in 10 NYCRR Part 59, purporting to establish standards respecting the techniques and methods for breath-alcohol testing, is not governing. There is no express provision in the Vehicle and Traffic Law requiring compliance with the Health Department’s regulations as a condition for the admission into evidence of breath test results (People v Monahan, 25 NY2d 378). Rather, the validity of the test and the admission of the test results into evidence should be, and is, determined by their accuracy and reliability as determined by resort to generally accepted scientific standards. (See People v Meikrantz, 77 Misc 2d 892.) Similarly, the absence *695 of compliance with 10 NYCRR 59.4, in that the Intoximeter 3000 is not listed by the director of the State Police laboratory as a device which meets the criteria of the Department of Health, is not a bar to the admission into evidence of its test results where otherwise not prohibited by law.[6]
Essentially both threshold arguments by the defendant beg the basic question: Can the Intoximeter 3000 reliably and accurately measure the amount of alcohol in a driver’s blood through an analysis of the subject’s breath?
The law with respect to the admissibility of evidence derived from a scientific test or process has its touchstone in Frye v United States (293 F 1013, 1014): Is the process “sufficiently established to have gained general acceptance in the particular field in which it belongs”?
New York courts have consistently employed the Frye criterion to determine the admissibility of scientifically derived evidence. It has served as the basis for excluding the results of lie detection tests conducted with the pathometer (People v Forte, 279 NY 204), the polygraph (People v Leone, 25 NY2d 511), and voice stress analysis (People v Tarsia, 50 NY2d 1). Conversely, Frye has been used to sanction the introduction of breathalyzer test results (People v Donaldson, 36 AD2d 37) and automobile speed evidence obtained with radar (People v Magri, 3 NY2d 562).
Thus, the inquiry at hand becomes whether the process of analyzing breath by means of infrared energy and electrical current is sufficiently established so as to have gained general acceptance in its field. It is the conclusion of this court that it has.
The identification of unknown compounds by means of principles of infrared molecular absorption is well recog *696 nized and accepted by the scientific community, as attested to by the defendant’s own expert witness. This process, based on the generally recognized Beer-Lambert law of absorption, has been practically applied in research instruments such as the spectrophotometer. The infrared process incorporated in the Intoximeter 3000, while more restricted and narrower in scope than that of the spectrophotometer, is nonetheless the same process and is capable of detecting the presence and quantity of a certain group of substances, including ethyl alcohol, which have a major infrared absorption band at 3.39 microns. Thus it is the conclusion of this court that this portion of the Intoximeter 3000 process — relying upon infrared analysis — is based upon generally accepted scientific principles and methods and is sufficiently established and accepted in the scientific community so as to have gained general acceptance in its field.
However, this can not end the discussion. If infrared analysis were the only process incorporated in the Intoximeter 3000, the results of its tests would be inadmissible because the test would lack specificity in light of the numerous substances, in addition to ethyl alcohol, which absorb infrared energy at the wavelength of 3.39 microns.
This lack of specificity in the report of the Intoximeter’s infrared sensor is fully compensated for by its semiconductor sensor. The utility of semiconductors in electrical devices cannot be gainsaid. They are generally recognized in the scientific community and the electronics industry as being capable of conducting varying rates of electrical current depending upon the environment in which they are located. Thus, as has been empirically demonstrated, a Taguci-type semiconductor is able to distinguish between the various substances which absorb infrared energy with a wavelength of 3.39 microns by conducting electrical currents of varying strengths depending upon what substances are present in its environment. For each such substance, including ethyl alcohol, the semiconductor transmits an electrical current of a specific strength which can be empirically predetermined.[7]
*697 Even though the Intoximeter 3000 incorporates two processes which the court concludes are generally accepted in the scientific community and in their respective fields, it takes the Intoximeter’s computer to tie the two separate processes together into a coherent, reliable system for the detection of ethyl alcohol in a subject’s breath. During a test, the computer performs the essential function of comparing the semiconductor reading with that stored in its memory for the quantity of interferent, including ethyl alcohol, reported by the infrared sensor. The computer then makes any necessary reduction in the infrared reading due to the presence of any nonethyl alcohol interferents. That a computer is capable of performing such tasks is beyond doubt in this technological age.
Dr. Arthur Flores, a chemist and project director for the breath-alcohol program of the United States Department of Transportation, charged with the duty of evaluating breath-alcohol testing devices for the National Highway Traffic Safety Administration, testified that extensive tests were performed on the Intoximeter 3000 in 1980 and 1981 to determine the accuracy and reliability of the machine as evidential breath testers in determining the blood-alcohol content of a suspected drunk driver. The machine passed all Federal requirements and that fact was published in the Federal Register. This means that the National Highway Traffic Safety Administration will provide Federal funds under section 402 of the Highway Safety Act of 1966 (US Code, tit 23) to assist the States in purchasing the Intoximeter 3000.
The Intoximeter 3000 is used not only in the State of New York, but in the States of Idaho, Wyoming, Wisconsin, and Alaska, and countrywide in England.
For all of the reasons stated above it is the ultimate conclusion of this court that processes used by and incorporated in the Intoximeter 3000 are generally accepted in the *698 scientific community and in the fields in which they belong, and that the Intoximeter 3000 reliably and accurately detects and measures the quantity of ethyl alcohol in the blood of a driver to the exclusion of any other substance. Therefore, the defendant’s motion to suppress the results of the Intoximeter 3000 test given to him following his arrest for operating a motor vehicle while under the influence of alcohol in violation of subdivisions 2 and 3 of section T192 of the Vehicle and Traffic Law is denied.
The findings of fact and conclusions of law heréin are made upon clear and convincing evidence.

. Section 1192 of the Vehicle and Traffic Law defines driving while intoxicated in terms of a percentage by weight of alcohol in the blood: “2. No person shall operate a motor vehicle while he has .10 of one per centum or more by weight of alcohol in his blood as shown by chemical analysis of his blood, breath, urine or saliva, made pursuant to the provisions of section eleven hundred ninety-four of this chapter.” The validity of breath analysis to determine blood-alcohol content is based on the scientific principle known as Henry’s law which states that at any given temperature, the ratio between the concentration of alcohol in the blood and that in the alveolar air in the lungs is constant. The ratio has been found empirically to be 2,100:1 — i.e., 2,100 parts of deep lung air contain the same amount of alcohol as one part of blood. This ratio was adopted by the National Highway Safety Council’s Committee on Tests for Intoxication in 1952 and has been questioned and reaffirmed since then. In 1972, for example, an ad hoc committee on blood-breath alcohol relationship sponsored by Indiana University indorsed the continued use of the 2,100:1 ratio. (See 4 Gray, Attorneys’ Textbook of Medicine, par 133.73 [1].)

. The principle underlying infrared analysis of substances derives from the Beer-Lambert law of absorption. This law is the theoretical basis for the operation of devices such as the spectrophotometer as well as the Intoximeter 3000. According to this law, molecules absorb electromagnetic radiation. However, this molecular absorption is *689 selective: only radiation of certain wavelengths will be absorbed by a molecule of any given compound. A compound will absorb radiation of a number of different wavelengths depending upon what elements are present in that compound and how those elements are bonded to each other in the compound. Thus, ethyl alcohol, composed of atoms of carbon, hydrogen and oxygen in a number and array unique to that substance, will absorb radiation at wavelengths of approximately 3.00, 3.39, 7.25, 9.18, 9.50 and 11.5 microns. (These numbers represent the highest levels or “peaks” of absorption. The absorption actually begins and ends at wavelengths surrounding those numbers — e.g., from 9 to 10 microns.) No other compound absorbs radiation at those wavelengths and no other wavelength.
It might be said that every chemical compound has “fingerprints” which are unique to it and by which the compound may be identified through infrared spectroscopy. While each chemical compound has its own spectrograph showing all the wavelengths at which it absorbs radiation, more than one compound may absorb energy at any one particular wavelength. Thus, while ethyl alcohol has a major absorption band at 3.39 microns, other compounds such as methyl alcohol, acetic acid, and ketone, including acetone, absorb at that wavelength as well. Thus, the fact that an unknown compound absorbs radiation in the vicinity of 3.39 microns merely narrows down the identity of such compound; in order to specifically identify the compound as ethyl alcohol, an additional process for factoring out other substances which absorb energy at a wavelength of 3.39 microns is necessary. The infrared spectrophotometer can accomplish the entire task by itself by reason of its ability to reverse the entire absorption pattern of a substance through a spectrum ranging from 1 to 100 microns, not just that at a wavelength of 3.39 microns; but it is a much more costly machine than the Intoximeter 3000 and is primarily a sophisticated laboratory instrument not geared to the operational ease required in intoxication testing by law enforcement personnel. However, the same result of factoring out substances other than ethyl alcohol that absorb energy at a wavelength of 3.39 microns is accomplished by the Intoximeter 3000 by the use of a semiconductor device.

. By “interfering substance” is meant any substance that absorbs radiation at 3.39 microns, among which are ethyl alcohol and acetone.

. All known elements generally fall into one of two categories, insulator or conductor, depending upon their electrical conductivity. Conductors (also known as metals) will *691 permit electricity to pass through them; insulators (nonmetals) impede this flow of electrons. This phenomenon occurs across a range of temperatures. There are, however, two elements which are not so readily classified. Silicon and germanium are unique among the elements in that they are insulators at low temperatures and conductors at high temperatures. This characteristic of “semiconductors” makes them useful in electrical devices in which a variable rate of conductivity is required. The use of semiconductors prompted the demise of the vacuum tube as the essential component in such instruments. The semiconductor itself has been succeeded in certain applications by the microchip, also made of silicon, which can perform the same functions, at a faster rate, while utilizing less space in instruments.

. The Intoximeter 3000 reports all nonethyl alcohol interfering substances found by the semiconductor as “acetone”, even though there may theoretically be some other *692 interferent present. Acetone not only is the most common interfering substance found in the human body that, like ethyl alcohol, absorbs infrared radiation at a wavelength of 3.39 microns, but is the only such interferent present in the human body (and mostly in diabetics and persons on longstanding stringent diets) in sufficient quantity and with sufficient vapor pressure so as to appear in the breath and register on the Intoximeter 3000. In the vast multitude of cases, what is reported by the infrared sensor will be ethyl alcohol.
However, the semiconductor sensor is still always present to take care of the aberrational case and assure that the final reading of the Intoximeter 3000 is purely ethyl alcohol.
The actual identity of the interfering substance reported by the semiconductor, which realistically will always be acetone, is actually irrelevant because we are only interested in the quantity of the interferent and not its identity.
The above conclusions are supported empirically by numerous laboratory and field tests, not only by the manufacturer but by the National Highway Traffic Safety Administration.

. 10 NYCRR 59.4 lists four criteria for breath-alcohol testing devices. Interestingly the Intoximeter 3000 does, in fact, meet all of these criteria. The device does, in fact, collect and analyze a fixed volume of alveolar breath; it also is capable of analyzing and, in fact, does analyze reference samples of alcohol, and its analysis thereof has been shown to be within .01% of the certified alcohol content of the reference solution. As to the final criterion (that the procedure’s specificity be adequate and appropriate for the analysis of breath specimens for the determination of alcoholic concentration in traffic law enforcement), that is the very question addressed in the hearings on this motion and in this opinion and which question the court herein answers in the affirmative.

. The efficacy of the semiconductor’s ethyl alcohol/acetone discrimination has been demonstrated in the laboratory. Arthur Flores, project director for the National High *697 way Traffic Safety Administration (NHTSA), a witness for the People, testified that as part of his testing of the Intoximeter 3000 for NHTSA certification, he tested its acetone detection feature and found that it operated as described. This conclusion is supported by similar studies done by Intoximeters, Inc., the manufacturer and by the State of Idaho Department of Health and Welfare, Bureau of Laboratories (as reported in 1 Erwin, Defense of Drunk Driving Cases [3d ed], ch 19A, pp 19A-3 — 19A-5).