732 P.2d 339

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Merlyn Dean HARTWIG,
Defendant-Appellant.**

Nos. 15718, 15719.

Court of Appeals of Idaho.

Jan. 26, 1987.

Danny J. Radakovich, Lewiston, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Michael A. Henderson, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

Following his arrest by a Lewiston police officer, Merlyn Hartwig was found guilty by a jury of driving under the influence and of resisting an officer. In his appeal from the judgments of conviction Hartwig asserts that the district court erred (1) in denying Hartwig's challenge to an unusual jury selection process employed in his case; (2) in denying the suppression of verbal communications made by Hartwig during sobriety tests administered before his arrest; (3) in admitting evidence of the re-

sults of Hartwig's intoximeter test; (4) in instructing the jury concerning the elements of a charge of driving under the influence; and (5) in instructing the jury concerning an arrestee's right to resist the use of excessive force by an arresting officer. We agree with Hartwig's challenges to the jury selection process and to the instruction regarding an arrestee's right to resist a police officer's use of excessive force. We reverse both judgments and remand this case for a new trial.

Late one evening in April, 1984, a Lewiston police officer stopped Merlyn Hartwig for a suspected driving under the influence violation. A second officer arrived at the scene a short time later. The officer who stopped Hartwig administered sobriety tests to Hartwig, and, based on Hartwig's poor performance, the officer decided to arrest Hartwig for driving under the influence of alcohol. As the officers were attempting to arrest Hartwig, an altercation occurred between Hartwig and the two officers. The officers testified that Hartwig had grabbed the tailgate of his pickup truck and refused to let go so that he could be handcuffed. According to Hartwig, however, his hand was merely on the tailgate when one of the officers hit him from behind. Hartwig testified that he then grabbed the tailgate to keep from falling, and that he never resisted the officers. During the incident between Hartwig and the officers, Hartwig was injured. As a result of this confrontation, Hartwig was charged with driving under the influence and also with resisting the officers.

In an attempt to alleviate a congested court calendar in the magistrate division, a district judge assumed jurisdiction over twenty-nine criminal cases, including Hartwig's. The district judge then set a simultaneous commencement date for Hartwig's trial and for the trials of four other defendants, all of whom were also charged with DUI. The judge ordered jury selection for the first of the five cases to begin on the designated date. Jury selection in each subsequent case would begin immediately after jury selection in the previous case, until juries had been selected for all five

cases. The judge then set a later date and time for the actual trial in each case to begin.

Hartwig's attorney moved to quash the judge's order regarding the proposed jury selection process on the grounds that such a procedure denied Hartwig the ability to conduct a meaningful voir dire of the jury and impinged on Hartwig's right to challenge individual jurors. The district court denied the motion. A jury was then selected for Hartwig's case and for the other cases, except for one case which had been settled in the meantime. Because the juries had been selected from a single panel, some members of Hartwig's jury were also on the juries for the other three cases.

Hartwig's trial, the last of the four cases to be tried, was held twenty-four days after the jury had been selected. As a result of the jury selection process, five of the six jurors on Hartwig's jury had been jurors on at least one of the three prior DUI cases.

At trial, Hartwig objected to introduction of evidence concerning the results of the intoximeter test that Hartwig had been given the night of his arrest. Hartwig also objected to introduction of the results of those sobriety tests which had required Hartwig to verbally communicate with the officers. Hartwig also challenged two instructions by the district court. One instruction dealt with the elements necessary to establish guilt on a DUI charge. The other challenged instruction concerned Hartwig's right to resist excessive force used by an arresting officer. The jury found Hartwig guilty of both the DUI and the resisting arrest charges. We conclude that the jury selection process did violate Hartwig's right to select an impartial jury, thus necessitating a new trial on both charges. We also conclude that the court improperly instructed the jury regarding an arrestee's right to resist excessive force used by an arresting officer. We will discuss each of Hartwig's asserted errors in turn.

## I

## The Jury Selection Process

█ A defendant is entitled to a jury that is impartial and indifferent. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *State v. Sanger*, 108 Idaho 910, 702 P.2d 1370 (Ct.App.1985). The jury need not be composed of members wholly lacking initial impressions or opinions, but it must consist of members who can set aside their views and reach a verdict based on the evidence as presented in court. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In selecting a jury, a defendant has the opportunity to conduct voir dire examination of the jury panel in order to develop information to help identify those potential jurors who are or may be so biased that the defendant's right to a fair trial may be abridged. In pursuit of this information, which may lead to the challenge of a potential juror, counsel are granted wide latitude in voir dire examination. *State v. Camarillo*, 106 Idaho 310, 678 P.2d 102 (Ct.App.1984). The scope of voir dire is a matter of discretion with the trial court, and, unless that discretion is abused, the trial court's decision will not be disturbed on appeal. *Id.* Here, we conclude that such an abuse of discretion did occur.

We are cognizant of the trial court's good intentions in its endeavor to alleviate a crowded court docket. However, we are convinced that the jury selection process here so eroded the voir dire procedure that Hartwig's counsel was effectively precluded from developing the information necessary to make well-considered challenges to the prospective jury members. In a more ordinary situation, a jury is selected immediately prior to trial. Here, twenty-four days elapsed between the selection of the jury and the defendant's trial. In that period, five of Hartwig's six jurors participated in cases involving other DUI charges. We acknowledge that prior service in a similar case, by itself, will not support a challenge for cause. *United States v. Mutchler*, 559 F.2d 955 (5th Cir. 1977), *modified*, 566 F.2d 1044 (5th Cir.

1978). Nor would such interim service necessarily result in disqualification based on implied bias. I.C. § 19–2020; *United States v. Haynes*, 398 F.2d 980 (2d Cir. 1968). *See also Holland v. State*, 260 Ark. 617, 542 S.W.2d 761 (1976); *Stott v. State*, 538 P.2d 1061 (Okla.Crim.App.1975). We have reached our conclusion not on any indication of actual or implied bias, but rather on the trial court's improper limiting of voir dire. The trial court has a "serious duty" to determine actual bias when impaneling a jury. *Dennis v. United States*, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950). We reason that an equal duty applies in determining implied bias. However, without adequate voir dire, guided by the trial court's discretion, neither actual nor implied bias will be brought to the surface and subjected to challenge by counsel. Nor will counsel be able to exercise a strategic or reasoned peremptory challenge. Here, the jurors sat on DUI cases in the interim between being selected for Hartwig's jury and the beginning of Hartwig's trial. Because of the selection process, any bias which may have arisen in that period would have been undiscoverable by either party or by the court without further voir dire examination. Under the circumstances of this case, we hold the trial court abused its discretion in scheduling the jury selection prior to trial without providing counsel an opportunity for further voir dire examination on the day of trial.

█ The state has presented to this Court a well organized argument asserting that Hartwig did not renew his objection to the jury selection process immediately prior to trial and is thus precluded from challenging the procedure on appeal. We have thoroughly reviewed the record and have concluded that Hartwig did sufficiently preserve the issue. Prior to trial Hartwig moved unsuccessfully to quash the order establishing the jury selection process. Hartwig pointed out that the process would deprive him of a meaningful voir dire and would also hinder his ability to challenge the jurors for implied bias. Hartwig's

counsel asked for and was granted a continuing objection to the process. As four of the jurors were selected, Hartwig's counsel again noted that his acceptance of these members of the jury was subject to his previous objection. After the entire jury was selected, Hartwig's counsel again noted that his acceptance of the jury was subject to the prior objection. Admittedly, if Hartwig had restated his objection immediately prior to trial, perhaps the trial judge might have allowed additional voir dire about the interim jury service. Possibly, such a procedure would have remedied the need for reversal on this issue. However, that additional voir dire did not occur. In light of Hartwig's continuing objection to the jury selection procedure and the trial court's refusal to initially modify the procedure, we conclude that the issue was properly preserved for purposes of appeal.

As an additional note, by our ruling we do not condemn the trial judge's innovative and novel approach in dealing with what was apparently a backlog of cases. A similar approach, coupled with subsequent inquiry by the court and supplemental voir dire by counsel, would perhaps be sufficient to meet constitutional safeguards requiring impartial and indifferent jurors. Unfortunately, that cannot be said of the jury in this case. Therefore, we reverse the judgments of conviction and remand for a new trial.

## II

### Verbal Communications During The Sobriety Tests

Hartwig's next issue concerns the field sobriety tests administered to him by the officer when Hartwig was stopped. Although we realize that a ruling on this issue is not necessary for a resolution of this case, we address the issue since in all likelihood it will be raised at the new trial.

The officer gave Hartwig several sobriety tests including an alphabet test in which Hartwig had to recite the alphabet from A to Z, and a counting test that required Hartwig to count backwards from twenty to one. Hartwig performed unsatisfactori-

ly on these and the other tests. The officer testified that after Hartwig failed the tests, he advised Hartwig of his constitutional rights and then asked Hartwig some questions about being epileptic or diabetic. After Hartwig responded in the negative to these questions, the officer decided to arrest him for driving under the influence.

■ Prior to trial, Hartwig moved to suppress the results of those sobriety tests that had required verbal responses. Hartwig asserted that these verbal responses violated his constitutional rights against self-incrimination. The motion was denied. Hartwig now asks us to distinguish between sobriety tests which require verbal communication, such as reciting the alphabet, and those tests, such as balancing tests, which only require that the officer visually judge the suspect's performance. Hartwig urges that *Miranda* warnings must be given prior to those sobriety tests which require verbal responses. We disagree.

*Miranda* warnings are required only when the suspect is interrogated while in custody or while he is otherwise significantly deprived of his freedom. *State v. McCurdy*, 100 Idaho 683, 603 P.2d 1017 (1979). In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court held that the roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for purposes of the *Miranda* doctrine. There the defendant was stopped by a patrolman who had observed the defendant's erratic driving. While at the scene of the traffic stop and preceding the defendant's arrest on a misdemeanor charge of driving under the influence of alcohol and/or drugs, the officer asked the defendant whether he had been using intoxicants. The defendant replied that he had consumed two beers and had smoked several marijuana cigarettes. In holding that the defendant's pre-arrest verbal response was admissible as evidence, the Court explained:

[T]he usual traffic stop is more analogous to a so-called "Terry stop," see *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968), than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 45 L.Ed.2d 607, 95 S.Ct. 2574 [2580] (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " Ibid. (quoting *Terry v. Ohio*, supra, at 29, 20 L.Ed.2d 889, 88 S.Ct. 1868 [1883].) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of Miranda. [Footnotes omitted.]

468 U.S. at 439–40, 104 S.Ct. at 3150–51. Here, the record clearly establishes that Hartwig was neither in custody nor significantly deprived of his freedom when the sobriety tests—including those requiring

verbal responses—were given by the officer "to obtain information confirming or dispelling the officer's suspicions" that Hartwig might have been under the influence while operating his vehicle. Under these circumstances, we hold that the absence of *Miranda* warnings did not render Hartwig's verbal responses inadmissible as evidence.

### III

### Results Of The Intoximeter 3000 Test

Hartwig's third issue on appeal challenges the admission of the results of the Intoximeter 3000 test which showed Hartwig's blood-alcohol content to be .16 percent. Again, we discuss this issue not because it is necessary for resolution in this case, but because in all likelihood the same issue will appear at a new trial.

■ Hartwig contends that a sufficient foundation was not laid for the admission of the test results. Specifically, Hartwig asserts that the state failed to show that the machine used a certain formula as specified in I.C. § 18–8004(4);[1] that the machine was not approved by the Department of Health and Welfare; and that proper maintenance was not performed on the machine.

The evidence showed that the officer who tested Hartwig was certified in the use of the machine by the state department of health and welfare. Another officer, who was responsible for maintenance, upkeep, and calibration of the machine, testified that he too was certified in its use, care, and operation, and that he had calibrated the machine properly. He also testified that his calibration had been checked and approved by the department of health and welfare. He further testified that the

---

**1.** Idaho Code § 18–8004(4) provides:

For purposes of this chapter, an evidentiary test for alcohol concentration is a determination of the percent by weight of alcohol in blood and shall be based upon a formula of grams of alcohol per one hundred (100) cubic centimeters of blood, per two hundred ten (210) liters of breath or sixty-seven (67) milliliters of urine. Analysis of blood, urine or breath for the purpose of determining the blood alcohol concentration shall be performed by a laboratory operated by the Idaho department of health and welfare under the provisions of approval and certification standards to be set by the department, or by any other method approved by the Idaho department of health and welfare.

machine had been approved by the department of health and welfare. Admittedly, the testimony did not establish what formula was used by the machine to calculate blood-alcohol content. However, we do not find that absence to be fatal to a question of admissibility of the test results. The evidence sufficiently established that the machine was approved by the department of health and welfare, and that the machine was properly calibrated and maintained. The logical inference from the testimony that the machine was approved by the department of health and welfare, and that the officers had been trained and certified in its use, care and maintenance, is that the machine used a formula consistent with statutory requirements.

Hartwig's other assertion regarding the admission of the results of the intoximeter test appears to be a general challenge to the scientific reliability of the Intoximeter 3000 machine. The general admissibility of the breath analysis process has been too long established to be subjected to challenge now on the basis of its scientific acceptability. Obviously, the reliability and performance of any given machine is subject to challenge. If there is evidence that any particular machine has malfunctioned or was designed or operated so as to produce unreliable results, such evidence would be relevant to both the admissibility and weight of the test results. However, Hartwig presented no such evidence that this machine malfunctioned, was improperly designed or was operated improperly. Rather, the record indicates just the opposite.

Hartwig's counsel indicates that he knows of no "case or statutory law in the State of Idaho" which establishes the accuracy and reliability of the Intoximeter 3000. In *State v. Nichols*, 110 Idaho 823, 718 P.2d 1261 (Ct.App.1986), we recently upheld an Intoximeter 3000 test result against a contention that the machine did not perform a "chemical test" under I.C.

§§ 49–352, –1102. A brief review of case law indicates that the Intoximeter 3000 is used, at a minimum, in the following states —Alaska, Georgia, Idaho, New Hampshire, New York, Tennessee, Wisconsin, Wyoming, and country-wide in England.[2] We conclude that the scientific acceptance of the Intoximeter 3000 is well-established, and Hartwig's assertion to the contrary is without merit.

## IV

Instruction On Elements of DUI Charge

■ Hartwig asserts the trial court erred in giving an instruction stating, in part, that one of the elements of a DUI charge is:

> That the act was committed while the defendant had 0.10 percent or more, by weight, of alcohol in his blood[.]

He argues that, instead, the court should have given his requested instruction reciting:

> That the act was committed while the defendant was under the influence of intoxicating beverages.

Hartwig urges that his instruction was more proper and that not giving his offered instruction was reversible error. We disagree. We previously have held that the Idaho DUI statute, (formerly I.C. § 49–1102 but now codified as I.C. § 18–8004), does not establish two separate crimes. *State v. Knoll*, 110 Idaho 678, 718 P.2d 589 (Ct.App.1986); *State v. Brown*, 109 Idaho 981, 712 P.2d 682 (Ct.App.1985). Rather, the statute provides for one crime with two alternative methods of proof. The state may establish the violation *per se* by proof of a blood alcohol content of .10 percent or, alternatively, by proving with other circumstantial evidence that the defendant was driving while under the influence of alcohol. The state's case here was based in part on the results of the intoximeter test which showed Hartwig's blood alcohol content to be .16 percent. Thus, we conclude

**2.** A detailed discussion of the characteristics, theory, operation, and scientific acceptability of the Intoximeter 3000 can be found in *People v.*

*Jones*, 118 Misc.2d 687, 461 N.Y.S.2d 962 (Co.Ct. 1983).

it was not error to give the instruction which the district court decided to use.

## V

### Instruction on Resisting Arrest

Hartwig's final assertion of error deals with the instruction given the jury concerning an arrestee's right to resist the use of excessive force by an arresting officer. The court instructed the jury that

An individual may not use force or any weapon to resist an arrest by one he knows or has good reason to believe is an authorized peace officer in the performance of his duties.

If a person has reasonable ground to believe he is being arrested by a peace officer, it is his duty to refrain from using force or any weapon in resisting arrest, regardless of whether or not there is a legal basis for the arrest.

This instruction was based on *State v. Richardson*, 95 Idaho 446, 511 P.2d 263 (1973). However, *Richardson* dealt with peaceful arrests, not the type of arrest alleged here.

■ A defendant has a constitutional right not to be subjected to excessive force by officers in the performance of their duties. *Sprague v. City of Burley*, 109 Idaho 656, 710 P.2d 566 (1985). Furthermore, a defendant has a right to defend himself against the use of excessive force by an officer. *Gray v. State*, 463 P.2d 897 (Alaska 1970); *Carter v. State*, 507 P.2d 932 (Okla.Crim.App.1973); *State v. Castle*, 48 Or.App. 15, 616 P.2d 510 (1980). A determination of excessive force is a question of fact for the jury. *Sprague v. City of Burley, supra.* An officer may be guilty of assault and battery for using unnecessary or excessive force. *Anderson v. Foster*, 73 Idaho 340, 252 P.2d 199 (1953).

Here, the evidence clearly showed that force had been used on Hartwig. Hartwig's wife testified as to his injuries and took pictures of those injuries. The testimony of Hartwig, the officers, and a high school student present at the arrest all were consistent in establishing the altercation between Hartwig and the officers.

However, as noted earlier, Hartwig's testimony was that one of the officers hit Hartwig in the head while he was standing beside his truck. The officers testified that it was Hartwig's grabbing the tailgate of his truck that led to the confrontation as the officers sought to handcuff and arrest Hartwig. In light of this testimony about the altercation and the resulting injuries to Hartwig, it was up to the jury to decide whether excessive force had been used. It was also for the jury to decide whether Hartwig had a right to defend himself. Thus, it was critical for the jury to be informed that if the officers had used excessive force, Hartwig had the right to defend himself against that force. In our view, the court's instruction simply informed the jury that Hartwig could not resist the officers. Such an instruction was a misstatement of the law in light of a permissible view of the evidence in this case. If upon retrial the evidence approximates that reflected in the record now before us, then the trial court should give an instruction to the jury about the defendant's right to resist excessive force employed during an arrest.

Hartwig's judgments of conviction for DUI and for resisting an officer are reversed. Case remanded for new trial.

SWANSTROM, J., concurs.

BURNETT, Judge, dissenting in part.

I respectfully disagree with Part I of the Court's opinion, relating to the jury selection process. In my view, the Court predicates error upon a ground not factually developed in the record.

It is important to recognize the narrow basis of the Court's decision. The Court rejects appellant's broad attack upon advance jury selection. As the Court explains, advance selection does not infringe upon the constitutional right to an impartial jury so long as the jurors may be questioned at trial about any possible bias or cause for disqualification that has arisen since the selection occurred. The dispositive question in this case is whether appel-

lant was denied the opportunity to make such an inquiry. The Court evidently thinks that he was. I believe the record indicates otherwise. The record contains no ruling or statement by the judge that voir dire at trial would be prohibited. Indeed, the record reveals that appellant made no attempt to conduct—nor did he ask leave to conduct—voir dire when the trial convened. He simply repeated his earlier objection to the advance selection process. Appellant hardly can complain that the trial court deprived him of something he did not request.

Having made no effort below to develop the pertinent facts, appellant now is unable to identify any juror who might have become biased against him as a result of prior jury service. He invites us, in essence, to presume that any juror who has participated in a criminal case harbors a bias against defendants. The law entertains no such sweeping presumption. I would hold that appellant has failed, upon this record, to establish error in the selection of the jury.